FILED & JUDGMENT ENTERED
Steven T. Salata

December  28  2017

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **Susan Gail Wallace Jacobs** | ) | |
| | ) | |
| | ) | **Case No. 15-31501** |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| | ) | |
| **Gray Layton Kersh Solomon Furr** | ) | |
| **& Smith, P.A.** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Adversary Proceeding** |
| | ) | **No. 15-03182** |
| **v.** | ) | |
| | ) | |
| **Susan Gail Wallace Jacobs** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER DISMISSING ADVERSARY PROCEEDING WITH PREJUDICE**

This adversary proceeding involves an unfortunate family dispute replete with finger pointing and hurt feelings.  The litigation pits a niece and nephew against their father's sister (their aunt).  After the niece's and nephew's father died, the aunt was appointed executrix of his decedent's estate and became president of the deceased's business.  At the heart of this fight, the niece and nephew (then teenagers) disagreed with how the aunt was managing their father's final affairs, was treating them poorly, and was

1

trying to steal their father's business.  The aunt believes the niece and nephew are ungrateful for all her efforts to "protect" them.

After the niece and nephew had their aunt removed as executrix, the decedent's estate and the decedent's company filed a state court lawsuit alleging the aunt committed fraud and negligence in her roles as executrix of the estate and as president of the company.  A two-week jury trial ensued during which the claims in favor of the estate were dismissed.  The company obtained a judgment for $262,689 plus costs.  However, the state court jury's award of damages does not apportion between the torts.

The aunt filed bankruptcy and was pursued by an assignee of the judgment, the plaintiff in this adversary proceeding, who now seeks to have the judgement debt declared nondischargeable under Code Section 523.

The outcome of this dischargeability action hinges on the distinction between the decedent's estate and the company.  Because the judgment was solely in favor of the company, the question before the Court is whether the aunt's actions as president against the company meet the standards required under Section 523 to render the debt nondischargeable.  To be abundantly clear, the aunt's actions as executrix against her niece and nephew could not be included in the state court's damages calculation because the estate was dismissed from the state court lawsuit.  Meaning, the aunt's misdeeds as executrix against her niece and nephew are not determinative of whether the judgment is a dischargeable debt in bankruptcy.

Having read thousands of pages of state court trial transcript, examining over 175 exhibits, and hearing two days of additional evidence, the Court concludes that plaintiff presented ample evidence of intentional wrongs the aunt committed against her niece and

nephew in her role as executrix.  Yet, claims for those wrongs would be in favor of the

decedent's estate (or perhaps personally in favor of the niece and nephew), were

dismissed at the state court trial, and were not included in the state court judgment

plaintiff now seeks to declare nondischargeable.  The debt at issue in this dischargeability

action is owed to the company, not the heirs, and the record lacks any indication that the

*company* suffered damages caused by the aunt's wrongdoing that would fall under one of

the narrow exceptions to discharge.  The Court must therefore conclude that plaintiff has

failed to meet its burden on the claims brought in this adversary proceeding.

### Background

During his life, Eddie Wallace operated several businesses, the most significant of

which was Ed Wallace Construction, Inc. (EWC).  EWC provided services to the gas

pipeline industry ranging from construction to emergency repairs.  Eddie Wallace was the

key employee of EWC, being the most experienced and only welder certified to make

certain repairs.

Eddie Wallace died in a motorcycle accident on May 24, 2007.  Eddie Wallace

was divorced when he died.  Per his will, Eddie Wallace left all of his property to Carey

Wallace, now Carey Bumgardner (Carey), and Clay Wallace (Clay), his two teenage

children (together, the heirs).  Eddie Wallace's decedent's estate consisted primarily of

his interest in EWC and his home.  Eddie Wallace's will additionally provided that Susan

Jacobs, Eddie Wallace's sister and the defendant of this adversary proceeding, was to be

appointed as the personal representative of his decedent's estate.

Pursuant to state law, on June 6, 2007, Jacobs was sworn as the executrix of Eddie

Wallace's estate and letters testamentary were issued.  She engaged attorney Wesley

Deaton to assist her in administering the estate.  Shortly thereafter, Jacobs called a meeting to discuss the future of EWC.  Jacobs, the heirs, Daniel Jacobs (Susan Jacobs' son), Jack Wallace (Eddie Wallace's and Susan Jacobs' brother), and Deaton attended the meeting.  At the meeting, Jacobs proposed that she be made president of EWC.  Although it was later understood to be unnecessary, a vote was taken to that effect.  As a result, Jacobs was named president of EWC and undertook management of its affairs.  Therein lies the genesis of this dispute.

EWC struggled due in part to Eddie Wallace's absence and to Jacobs' mismanagement.  Because Eddie Wallace was the only "gold card" certified welder, the company had a short timeline to fill the void else its contracts and licenses be lost. EWC's revenue declined, and the IRS began sending notices of unpaid taxes.  At one point, the IRS froze and levied on EWC's payroll account.

The heirs viewed Jacobs as the cause of EWC's financial downturn to say nothing of their own financial problems.[1]  In the year after Jacobs assumed the helm of EWC, she took numerous actions that the heirs would later claim were repugnant to her duties as executrix of their father's estate and in violation of her fiduciary duties to the company. These allegations include:

1.  Threatening to sell the home in which the heirs lived;

2.  Refusing to continue to pay for the heirs' living expenses using company funds as was the practice when Eddie Wallace ran EWC;

3.  Hiring Daniel Jacobs to work at EWC and paying him a higher salary than Clay;

4.  Replacing EWC's longtime accountant;

---

[1] At the time, both Carey and Clay were non-working students.

5.   Paying the new accountant over $150,000 to review and update company records dating back to nearly a decade before Eddie Wallace's death;

6.   Hiring personal friends to work at EWC to the exclusion of the heirs;

7.   Failing to prevent employees from spending corporate funds to buy person items;

8.   Refusing to allow the heirs access to the company premises and records;

9.   Failing to file an annual or final estate accounting within the time allowed by law; and

10. Failing to file estate taxes or request an extension to do so.

While all these events were unfolding, the heirs were calling for Jacobs to sell the company.  Their demands fell on deaf ears.

Eventually the heirs initiated legal action against Jacobs.  On July 7, 2007, the heirs filed a motion requesting that the Lincoln County Clerk of Court remove Jacobs as the executrix of their father's estate for the alleged actions listed above.  Deaton continued to represent Jacobs at the removal hearing before the Clerk.

The Clerk entered an order on October 8, 2008, finding in pertinent part:

> 3.  The Executor in this Estate has breached her fiduciary duties in that she has failed to file an annual or final accounting within the time allowed by law.  This Estate is more than 15 and ½ months old.
>
> 4. The Executor in this Estate has breached her fiduciary duties by not filing the Estate taxes within the time allowed by law and did not request for an extension which could cost the Estate penalties and interest.  This is a very important duty and lies solely with the Executor to perform that very important duty.
>
> 5.  Mrs. Jacobs, acting as President of the Corporation of the deceased, in her capacity as Executor of the Estate of Eddie Dale Wallace, employed family and friends to work for the Corporation which allows her now to have a personal interest in this Estate.  This interest is believed to be both direct and indirect.

> 6.  She has failed to communicate to the interest and desires of the heirs, in that Carey Ann Wallace, one of the only two heirs of this Estate, on more than one occasion requested that the Corporation be sold and that this Estate be settled.  She also fired an employee of the Corporation and this Court believes that the firing of this employee was based on the fact that she was giving information concerning the Corporation to Carey Ann Wallace after being warned by the Executor not to.

> 7.  The Executor made herself president of the Decedents[sic] Corporation and has acted in that capacity without the consent of the parties, command of the Will, or by Order of this Court.

The Clerk concluded that Jacobs was in violation of several provisions of Chapter 28A of the North Carolina General Statutes and therefore removed her as executrix of the estate. Jacobs was directed to file a final estate accounting and to turn over the estate to the attorneys for the heirs.

After the Clerk removed Jacobs, the relationship between Jacobs and her attorney, Deaton, deteriorated.  In a letter to Jacobs dated October 10, 2008, Deaton recounted the timeline of events leading to Jacobs' removal including numerous occasions where Jacobs had ignored Deaton's counsel.  In his letter, Deaton told Jacobs that she could file an appeal of the Clerk's order; however, Deaton stated that he was unwilling to represent her in such an endeavor.  Additionally, Deaton advised Jacobs that "[a]n appeal would *stay* the Clerk's order revoking your letters until the ultimate resolution of the appeal in Superior Court."

In hindsight, Deaton was incorrect regarding the effect of an appeal and a stay of the Clerk's order.  Pursuant North Carolina General Statute § 28A-9-4, the Clerk may issue a stay of an order revoking letters testamentary "upon the appellant posting an appropriate bond set by the clerk until the cause is heard and determined upon appeal."

There is no indication in the record that a request for a stay was ever made or that a bond was set and posted.  The Clerk's order was therefore never stayed.

Based on Deaton's (incorrect) advice, Jacobs filed a *pro se* notice of appeal on October 14, 2008, believing the Clerk's order would be stayed as a result.  A hearing on Jacobs' appeal was set for November 10, 2008.  Deaton made a limited appearance on Jacobs' behalf to request the hearing be continued.  According to Deaton's motion, the parties were engaged in settlement negotiations and agreed to the continuance to afford them more time to review new tax information.

From there, the removal action stalled for an extended period of time.  Jacobs continued to operate EWC and manage the estate in violation of the Clerk's order.  All the while, Jacobs was representing to the heirs that she was preparing the required estate documentation.  The heirs allowed Jacobs to continue in her role and took no legal action against her even though the conditions that they alleged warranted her removal persisted. This state of affairs lasted for over two years.  While it is not clear how the matter came back before the Lincoln County Superior Court, an order was entered on November 1, 2010, affirming the Clerk's order removing Jacobs.

Immediately after the Superior Court entered its order, Jacobs caused the decedent's estate to pay a $61,142.65 obligation of another of Eddie Wallace's businesses, Ed Wallace Rentals, LLC (EWR).  At the time, Jacobs apparently believed she was a personal guarantor on the EWR debt.  In fact, the debt was guaranteed by Eddie Wallace (personally) and by EWC.[2]

---

[2] The testimony of Clay Wallace was that this payment caused EWC to be cash strapped and struggle to make payroll.  However, the documentary evidence [Doc. 41-19] produced clearly shows the payment being made from the decedent's estate account, not

Before turning over control, Jacobs removed EWC's company records from EWC and proceeded to copy them. Jacobs returned the records a few days later. The evidence presented was not clear on the condition of the records before Jacobs took possession of them or if she failed to return any documents.

Carey succeeded Jacobs as executrix of Eddie Wallace's decedents estate, and Clay took over as president of EWC. When Clay became president, EWC had only about $6000 in its operating account.[3] To meet the company's immediate cash flow needs, Clay obtained loans from his mother. Though it appeared that EWC was on the brink of insolvency when Clay took over, EWC survived, is thriving, and is now more profitable than it was while Eddie Wallace was alive.[4]

## State Court Action

Following further disputes over Jacobs' commission for her services as executrix, Carey (personally and as executrix) and EWC filed an action in state court alleging that Jacobs damaged the estate and EWC through breach of fiduciary duty, negligence, unjust enrichment, misrepresentation, and fraud. The complaint alleged:

  a. The Corporation failed to meet its ongoing obligations due to
     negligence and neglect causing the Corporation's credit rating

---

from EWC. Meaning, any damage caused by this payment was to the estate, and those claims were dismissed by the state court. Clay's conflation of the decedent's estate and EWC occurred throughout this case. The heirs do not appreciate the legal distinctions between the two entities; they view the assets in their father's decedent's estate and EWC as one pot of money all of which belong to them.

[3] While the evidence is not clear, it seems that EWC had another account with Wells Fargo that held more funds.

[4] In the intervening years between Eddie Wallace's death and this bankruptcy action, Carey and Clay agreed that Clay would assume ownership of EWC. Clay testified that EWC has grown to 125 employees and that he is now being paid over $2000 per week plus a sizeable performance based bonus.

to be impaired and its ability to seek and acquire new jobs and projects to suffer. The defendant's neglect caused the Corporation to be unable to get a loan with a bank it had commonly acquired loans from in the past.

b.   Defendant caused or allowed employees of the Corporation to borrow significant sums from the Corporation without signed agreements or clear promises to repay

c.   Defendant caused the corporation to terminate its regular certified public accountant ("CPA") and retained a new CPA of her personal preference paying him over $150,000.00 just to update the Corporation's records.

d.   Defendant caused or permitted corporate employees to spend corporate funds in an amount exceeding $60,000 for personal purchases including beach trips, personal clothing, meals, groceries, snacks, personal hygiene and fitness, flowers, and other expenditures not related in any way to the business of the Corporation.

e.   Defendant failed to properly supervise the Corporation's financial records allowing false checks to be made payable out of the corporation's bank account to pay for other personal obligations of employees.

f.   Defendant caused the Corporation to pay an obligation of Ed Wallace Rentals, LLC, out of funds of the corporation because she believed she was a personal guarantor of that debt and by doing so depleted the Corporation of necessary working capital and cash that it needed for its operations for her personal benefit.

g.   Defendant failed to pay property taxes for parcels of real estate owned by Ed Wallace Rentals, LLC and in which the Estate had an interest causing penalties to be assessed by the relevant taxing authorities to the detriment of the Estate.

h.   Defendant improperly terminated employees and professionals that worked for the Corporation due to her personal relationships with them.

i.   Defendant refused to allow appropriate corporate officers to have access to the Corporation's financial information.

j.  Defendant removed payroll records, employee files, tax information, bank information, and other important corporate documentation from the Corporation's office when she was removed as executrix of the Estate and has failed to return all of such information to the plaintiff.

k.  Defendant allowed or caused inordinate salary increases for her son and other personal friends of hers whom she hired to work for the Corporation during her term as executrix and corporate officer.

Jacobs filed a counterclaim, asserting that she should be paid for her work as president of EWC and for her service as executrix.

Both sides presented evidence over the course of a two-week jury trial.

Significantly, at the close of Carey's evidence, Jacobs obtained a directed verdict that dismissed the claims brought by Carey both personally and as executrix of the estate. At the close of Jacobs' evidence, Carey and EWC obtained a directed verdict dismissing Jacobs' counterclaims.

Meaning, the only questions the jury considered were:

1.  Did Jacobs take advantage of a position of trust and confidence as a corporate officer of EWC?

2.  Did Jacobs act openly, fairly, and honestly as a corporate officer of EWC?

3.  Was EWC injured by the negligent performance of Jacobs as a corporate officer of EWC?

4.  Was EWC financially damage by a negligent representation of Jacobs?

5.  Was EWC damaged by the fraud of Jacobs?

The jury answered each question in favor of EWC and awarded EWC $222,689 in compensatory damages and $40,000 in punitive damages. Unfortunately, the award lumped all the compensatory damages together. From the verdict, there is no way to

discern the amount the jury awarded for negligence (questions three and four) as opposed

to the amounts the jury awarded for torts that may be nondischargeable in bankruptcy.

Both sides appealed to the North Carolina Court of Appeals.  However, both

withdrew their appeals prior to a ruling.

The law firm that represented Carey and EWC in state court, Gray Layton Kersh

Solomon Furr & Smith, P.A. (plaintiff) took an assignment of EWC's judgment in April

2015.

### Bankruptcy Proceedings

Jacobs filed a Chapter 7 bankruptcy petition on September 25, 2015.  Plaintiff

filed this adversary proceeding seeking to deny Jacobs her discharge under 11 U.S.C. §

727 and to have its judgment declared nondischargeable under 11 U.S.C. §§ 523(a)(2)(A)

and (B), (4), (6), and (7).[5]  Jacobs was initially represented by counsel in this action.  Her

attorney was permitted to withdraw in February 2017, and Jacobs has acted *pro se* ever

since.

### Parties' Positions

At the outset of this case, Jacobs sought vindication and wished to re-litigate

much of the state court trial.  She fervently disagreed that she had committed any

wrongs—intentional or otherwise—or owed EWC any debt at all.  For months, the

undersigned entered orders and instructed Jacobs that the *Rooker-Feldman* Doctrine

prevented her from using this forum as an appellate court to review and reverse the state

jury's decision.  Rather, the question presented was how much of the state judgment debt

would survive bankruptcy.  By the time these issues came on for trial, Jacobs appeared to

---

[5] Plaintiff since agreed that it lacked grounds to object to Jacobs' overall discharge under
Section 727.

have grasped this concept and instead asserted that she had not taken any intentional acts against the company's interests.  Rather, anything she did wrong was at most negligent, on the advice of counsel, and/or with an eye toward running the company for the benefit of the heirs.

Meanwhile, plaintiff has always taken the position that *res judicata* and collateral estoppel require the jury's *entire* verdict be declared nondischargeable.  According to plaintiff, Jacobs' negligence was akin to a "lesser included offense" of the intentional wrongs the jury found to have occurred.  Put differently, plaintiff believes that any of Jacobs' actions that were negligent were part-in-parcel of her intentional acts and should be treated together.  On this theory, plaintiff asserts that the evidence introduced in state court established that EWC's injuries were the natural and proximate consequence of Jacobs' nondischargeable acts.  According to plaintiff, the fact that the evidence could also form the basis of a claim for damages that are dischargeable is of no consequence because the damages for the intentional torts subsume anything that could be recovered for negligence.

### *Res Judicata* and Collateral Estoppel of State Court Proceedings in Actions Brought under 11 U.S.C. § 523

Plaintiff is correct that state court judgments can, in some circumstances, collaterally estop the litigation of issues in adversary proceedings in bankruptcy court.  *In re Duncan*, 448 F.3d 725, 728 (4th Cir. 2006).  However, this general principle does not permit us to simply assume that all debts are nondischargeable in cases involving torts that require intent as well as those with a lesser degree of scienter.  Dischargeability is a matter of federal law, informed by, but in the main independent from the underlying state law claims.  *Grogan v. Garner*, 498 U.S. 279, 289 (1991).  Apart from the fact that the

concept of "lesser included offense" is a creature of criminal law, not civil tort law, this

Court's review of the bankruptcy case law revealed no support for the proposition that the

entire debt should be declared nondischargeable because the damages for the intentional

torts subsume damages for negligence.  In fact, such an assumption would assure that the

state inquiry fully determines the federal inquiry, which is at odds with the Bankruptcy

Code and likely the United State Constitution.

The correct analysis requires independently comparing the state law claims with

the federal law claims of 11 U.S.C. § 523 and then determining which findings from state

court preclude re-litigation of identical issues in bankruptcy court.[6]  As explained by a

leading bankruptcy treatise:

> The nature of the record in the prior proceeding influences the
> bankruptcy court's collateral estoppel analysis in dischargeability
> proceedings. For example, if a prior court entered judgment against
> the debtor but made no specific factual findings (as frequently is
> the case in jury trials), the bankruptcy court must reconstruct the
> prior court's decisionmaking process. In some cases, the analysis
> may be a purely legal one—comparing the necessary elements of
> the claim on which judgment was entered with the elements of the
> bankruptcy nondischargeability claim.  In other cases, the
> bankruptcy court may need to consider materials from the first
> proceeding, such as pleadings, briefs and jury instructions, to
> ascertain what issues were actually decided by the prior court.
> Alternatively, if the prior court made specific factual findings, the
> bankruptcy court's task may be to determine whether those facts
> necessarily found by the prior court, as a whole, establish some or
> all of the elements of the section 523(a) claim at issue.

---

[6]  When determining whether a state court judgment has such a preclusive effect, courts
are to look to the relevant state law of collateral estoppel. *Duncan*, 448 F.3d at 728.  In
North Carolina, to successfully assert collateral estoppel, a party must show, *inter alia*,
"that the issue in question was identical to an issue actually litigated and necessary to the
judgment."  *Turner v. Hammocks Beach Corp.*, 681 S.E.2d 770, 773-74 (N.C. 2009)
(citation and quotation marks omitted).

4 COLLIER ON BANKRUPTCY ¶ 523.06 (Alan N. Resnick & Henry J. Sommer eds., 16th

ed.) [hereinafter COLLIER].

This bifurcated process is admittedly awkward.  Where the state verdict is not

specific, parties who have fought for and obtained a judgment in state court can find

themselves in a difficult spot.  Generally, nondischargeability is associated with

intentional, fraud-like torts.  A plaintiff with a state court judgment on fraud and

negligence would have likely presented evidence in state court bearing on the following

Section 523 dischargeability claim.  However, state court verdict sheets are usually not

written with a mind toward a subsequent bankruptcy.  They are rarely sufficiently

detailed to include all of the elements required to later find a debt is nondischargeable.[7]

While no one wants to re-litigate the trial that led to a state court judgment, that's

frequently the avenue plaintiffs are forced to take to protect their judgments from

discharge.

When faced with this trying predicament, the United States District Court in this

judicial district has prescribed the following procedure.  First, the bankruptcy court is to

consider the state court verdict sheet.  *Keever v. Gallagher (In re Gallagher)*, No. 3:10-

CV-00237-W, 2011 WL 1130878, at *5 (W.D.N.C. Mar. 25, 2011), *aff'd*, 464 F. App'x

163 (4th Cir. 2012).

---

[7] For instance, a leading family law treatise in North Carolina notes, "The North Carolina
Supreme Court established in an early case that both compensatory and punitive damages
are available in the actions for alienation of affections and for criminal conversation.
When plaintiffs allege and establish both torts in this state, however, the trial court should
combine them in determining damages.  Since the elements of damages are so closely
related, they do not support separate awards for each tort."  1-5 LEE'S NORTH CAROLINA
FAMILY LAW § 5.48 (2016).

If reviewing the verdict sheet does not resolve the dispute, the bankruptcy court is then to consider the state court transcript of the evidence presented to the jury. *Id.* ("Obviously, the preferential method for the bankruptcy court to have determined how to apportion damages would have been to review and rely on a special verdict form, or, since that did not exist, the transcript of the evidence presented to the jury in the State Court Action."). If the court remains unable to make the requisite findings on nondischargeability, a supplemental trial may be conducted. *Id.*

In keeping with the direction of the United States District Court and with the parties' consent, first the undersigned considered the verdict sheet, but was unable to make a determination based on that document alone. The parties then both moved for summary judgment, and the Court undertook an in-depth review of the state court transcript and exhibits presented to the state court jury. This review was also not fruitful. The Court was unable rule as a matter of law and consequently set the case for trial.

The parties agreed that this Court could consider the state court transcript and state court trial exhibits as evidence in the current adversary proceeding. Prior to the trial, the Court read the entire 2322-page state court transcript and examined each of the exhibits presented to the jury. In addition to these materials from state court, the parties were to present supplemental evidence on the elements required to declare a debt nondischargeable.

Unfortunately, at the trial, the parties mainly focused on re-hashing the evidence presented in state court.  In addition, plaintiff called Casey, Clay, and Jacobs as witnesses.[8]  Jacobs also testified as a witness during her own case-in-chief.

Prior to presenting its case, plaintiff consented to dismissal of the counts under 11 U.S.C. § 523(a)(7) and 11 U.S.C. § 727.  Meaning, the only issues left to be resolved are whether the debts owed by Jacobs to EWC are nondischargeable due to fraud or false pretenses under 11 U.S.C. § 523(a)(2)(A), due to fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4), or due to willful and malicious injury under 11 U.S.C. § 523(a)(6).

## Analysis

One primary purpose of the Bankruptcy Code is to give the honest but unfortunate debtor a fresh start.  To that end, a bankrupt debtor enjoys the presumption that all debts are dischargeable pursuant to Section 727, and exceptions to discharge are construed strictly against creditors.  *In re Rountree*, 478 F.3d 215, 219 (4th Cir. 2007).  In an action brought under Section 523, the party seeking to establish an exception to the discharge of a debt must prove the requisite elements by a preponderance of the evidence.  *Garner*, 498 U.S. at 291.  With these fundamental principles in mind, the Court will set out the controlling law of plaintiff's remaining causes of action and point out instances of how plaintiff has failed to carry its burden as to each:

---

[8] In terms of credibility, though the witnesses' opinions and views of the events were certainly slanted in favor of their own self-righteousness (as would be expected in any family dispute), their factual averments appeared credible.

*Dischargeability Objection under 11 U.S.C. § 523(a)(2)(A)*

Under 11 U.S.C. § 523(a)(2)(A), debts are nondischargeable to the extent they

were obtained by "false pretenses, a false representation, or actual fraud."  Courts

generally speak of false pretenses and false representations together and require "four

elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain

from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on

the misrepresentation."  *In re Biondo*, 180 F.3d 126, 134 (4th Cir. 1999).  The fraudulent

misrepresentation element "is satisfied if the debtor's representation was known to be

false or recklessly made without knowing whether it was true or false."  *Boyuka v. White

(In re White)*, 128 Fed. Appx. 994, 998 (4th Cir. 2005) (citing *In re Woolley*, 145 B.R.

830, 834 (Bankr. E.D. Va. 2001)).

A debt may be nondischargeable under 11 U.S.C. § 523(a)(2)(A) even absent a

false representation if the debt was obtained through actual fraud.  *Husky Int'l Elecs., Inc.

v. Ritz*, 136 S. Ct. 1581, 1586 (2016).  "Actual fraud consists of any deceit, artifice, trick

or design involving direct and active operation of the mind, used to circumvent and cheat

another—something said, done or omitted with the design of perpetrating what is known

to be a cheat or deception."  4 COLLIER ¶ 523.08.  In short, "anything that counts as

'fraud' and is done with wrongful intent is 'actual fraud.' "  *Husky Int'l*, 136 S. Ct. at

1586.

Considering the evidentiary record (which, for clarity, consists of both the

proceedings in state court and in bankruptcy court), the Court concludes that plaintiff has

failed to meet its burden under 11 U.S.C. § 523(a)(2)(A).  Plaintiff failed to show that

Jacobs either committed actual fraud or made a fraudulent misrepresentation to EWC.

Even if Jacobs had made a fraudulent misrepresentation, plaintiff has not shown that

EWC acted or refrained from acting based on that alleged misrepresentation.  Further,

this evidentiary record does not support any amount of damages to EWC that would be

attributable to either Jacobs' fraud or fraudulent misrepresentation.

*Dischargeability Objection under 11 U.S.C. § 523(a)(4)*

Debts owed due to "fraud or defalcation while acting in a fiduciary capacity" are

nondischargeable.  11 U.S.C. § 523(a)(4).  " 'Defalcation' " refers to a failure to produce

funds entrusted to a fiduciary."  4 COLLIER ¶ 523.10.  An action under 11 U.S.C. §

523(a)(4) to declare a debt owed due to defalcation nondischargeable requires proof of an

intentional wrong.  *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273 (2013).[9]

"Intentional" in this context includes "not only conduct that the fiduciary knows is

improper but also reckless conduct of the kind that the criminal law often treats as the

equivalent."  *Id*. at 274.  Actual knowledge of the wrongdoing is not required; rather,

defalcation may occur where a "fiduciary 'consciously disregards' (or is willfully blind

to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a

fiduciary duty."  *Id*. (citations omitted).  "That risk 'must be of such a nature and degree

that, considering the nature and purpose of the actor's conduct and the circumstances

known to him, its disregard involves a gross deviation from the standard of conduct that a

law-abiding person would observe in the actor's situation.'"  *Id*. (citations omitted).

Particularly important in this action, the Supreme Court has explained the heightened

scienter for a finding of defalcation is most likely to help "*nonprofessional* trustees,

---

[9] " 'Defalcation' . . . can encompass a breach of fiduciary obligation that involves neither
conversion, nor taking and carrying away another's property, nor falsity."  *Bullock*, 569
U.S. at 275.

perhaps administering small family trusts potentially immersed in intrafamily arguments that are difficult to evaluate in terms of comparative fault." *Id*. at 276.

Plaintiff's evidence reflects that this adversary proceeding is the type of "intrafamily" dispute that the Supreme Court has described as insufficient of a defalcation claim brought under 11 U.S.C. § 523(a)(4). Indeed, Jacobs was a "nonprofessional trustee" who was running a "small family" company and "immersed in intrafamily arguments." *Bullock*, 569 U.S. at 276. There was no evidence presented that Jacobs was engaged in conduct she either knew was improper or that was reckless in the sense it would amount to a crime.[10]

At most, Jacobs is guilty of continuing in her role as executrix and president of EWC for two years after the Clerk's removal order. But even then, Jacobs was acting on advice of counsel that the order was stayed, and the heirs allowed her to continue in this role, seemingly without contest.

Also fatal, the evidentiary record is inadequate to support any amount of damages owed to EWC that would be attributable to Jacobs' alleged defalcation and therefore be nondischargeable. Accordingly, the Court concludes that plaintiff has failed to meet its burden under 11 U.S.C. § 523(a)(4).

*Dischargeability Objection under 11 U.S.C. § 523(a)(6)*

Pursuant 11 U.S.C. § 523(a)(6), debts are nondischargeable when caused by "willful and malicious injury by the debtor to another entity or to the property of another entity." Typically, debts found to be nondischargeable under this subsection are related

---

[10] For instance, plaintiff wishes to characterize EWC employees' use of company funds as defalcation by Jacobs. However, Jacobs took efforts to have employees repay EWC which negates plaintiff's assertions that Jacobs' actions were reckless or criminal.

to intentional torts.  4 COLLIER ¶ 523.12.  To prevail under 11 U.S.C. § 523(a)(6), the

plaintiff must show that the defendant's acts leading to the debt were " 'done with *the*

*actual intent to cause injury*.' " *Duncan*, 448 F.3d at 729 (citation omitted); *see also*

*Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) ("The word 'willful' in (a)(6) modifies the

word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*,

not merely a deliberate or intentional *act* that leads to injury.").

Even as plaintiff posits that Jacobs intentionally harmed EWC, plaintiff's ultimate

theory is that Jacobs intended to steal EWC for herself.  These accusations are

incompatible.  If Jacobs was trying to steal EWC, why would she intentionally try to

harm the company?  Any such acts would ultimately fall back to injure her own alleged

interest.  The Court believes plaintiff's latter theory is more likely, that Jacobs was trying

to steal EWC from the heirs, or at least that she tried to delay turning over control long

enough to boost her executrix commission.  Both are damages to the estate, not to EWC.

To be fair, plaintiff presented a wealth of evidence that Jacobs intentionally

harmed the heirs and was "in over her head" in terms of being president of EWC.  The

Court agrees with many of the heirs' assessments regarding Jacobs' management

decisions.  For instance, it was probably not the best business decision to replace EWC's

longtime accountant.  Though that decision cost EWC thousands of dollars, the Court

cannot conclude that Jacobs proceeded with an intent to harm the company within the

meaning of *Geiger*.

Rather, the evidence weighs more in favor of Jacobs believing she was acting in

the best interests of EWC.  As with all the other instances to which plaintiff directed the

Court, Jacobs was generally negligent in her actions as president of EWC, and negligence cannot form the basis of a claim under Section 523(a)(6). *Duncan*, 448 F.3d at 729.

Finally, even had plaintiff shown some intentional injury, plaintiff failed to put forth sufficient evidence from which a finder of fact could calculate damages caused by such acts that would be nondischargeable under Section 523(a)(6). Consequently, the Court concludes that plaintiff has failed to carry its burden on this cause of action.

*Punitive Damages*

While not a stand-alone action, the Court feels compelled to address punitive damages separately. Plaintiff seems to believe that any award of punitive damages falls under the auspices of Section 523 and should thus be declared nondischargeable. Plaintiff argues further that the award of punitive damages also makes the entire underlying damages award nondischargeable. However, in North Carolina, juries are instructed that punitive damages may be awarded for conduct that does not always lead to a nondischargeable debt in a following bankruptcy.

The United States District Court in this district has specifically rejected plaintiff's argument in *Keever v. Gallagher*, No. 3:06-CV-00108-W, 2007 WL 782183, at *4 (W.D.N.C. Mar. 13, 2007). That decision dealt with jury instructions that were nearly identical to those given in the state court in this action. *Id*. ("Furthermore, the various pattern jury instructions on punitive damages offer alternative reasons to support such an award, including 'actual malice, oppression, a gross and willful wrong, insult, rudeness, indignity, or a reckless or wanton disregard of the plaintiff's rights,' N.C.P.I.-Civil 810.90, or 'maliciousness, willful or wanton injury, or gross negligence,' N.C.P.I.-Civil 810.91. For the reasons in *Duncan*, these alternative findings do not satisfy the

requirement that the 'willful and malicious injury' issue was 'actually litigated' and 'necessary and essential to' the judgment in the State Court Action." (citing *Duncan*, 448 F.3d at 730)).  As with the other portions of the state court judgment, plaintiff has failed to establish that the award of punitive damages should be declared nondischargeable.

### Conclusion

Perhaps the jury thought Jacobs' negligence amounted to 99% of the damages, maybe only 1%, or possibly somewhere in between.  The jurors may even have crafted a remedy they felt fitting of the wrongs committed against the heirs rather than EWC.[11]

No one will ever know exactly how the jurors arrived at their verdict or how they apportioned damages between negligence and intentional torts.  The resolution of the adversary proceeding does not require this Court to read the tea leaves to glean the jury's actual thoughts.  Dischargeability is a federal action independent from the underlying state court claims, and in this setting, plaintiff has the burden to make its case for nondischargeability.  Having considered all the evidence and testimony presented in both state court and in this forum and construing exceptions to discharge strictly against creditors as we must, the Court concludes that plaintiff has failed to meet its burden of demonstrating that any part of the state court judgment awarding damages to EWC is

---

[11] The jury heard two weeks of testimony on this bitter family dispute, including testimony of Jacobs' particularly abrasive handling of the heirs in the wake of their father's death.  For instance, Jacobs stopped paying the heirs' living expenses, she wrote a negative letter to the North Carolina Licensing Board for General Contractors hoping to deny Clay a contractor's license, she locked the heirs out of EWC, and she threatened to sell the home where the heirs lived.

nondischargeable under 11 U.S.C. § 523.  This adversary proceeding is therefore

dismissed with prejudice.[12]

This Order has been signed                                   United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.

---

[12] On a final note, had Jacobs requested a directed verdict at the conclusion of plaintiff's
presentation of evidence, the Court would have been inclined to grant her request.